IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CRISTLE PLAIN,

        Plaintiff,

v.                                Case No. 19-2748-JWB

NICHOLS MANAGEMENT, INC.,

        Defendant.

## MEMORANDUM AND ORDER

This matter is before the court on Defendant's motion for summary judgment (Doc. 63) and Plaintiff's motion for sanctions (Doc. 65). The motions are fully briefed and ripe for decision. (Docs. 64, 70, 70, 77, 80, and 83.) For the reasons stated herein, Defendant's motion for summary judgment (Doc. 63) is GRANTED IN PART AND DENIED IN PART; the motion is GRANTED as to Plaintiff's claims under the Kansas Act Against Discrimination and DENIED as to all other claims. Plaintiff's motion for sanctions (Doc. 65) is DENIED without prejudice to refiling.

### I. Background

Plaintiff was formerly employed at a McDonald's franchise restaurant in Pittsburg, Kansas owned by Defendant. Plaintiff contends Defendant subjected her to employment discrimination on account of sex, including harassment in the form of a hostile work environment, and unlawful retaliation, all in violation of the Kansas Act Against Discrimination (KAAD), K.S.A. 44-1001 et seq., and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Doc. 59 at 7-8.) Defendant moves for summary judgment on all claims. It first argues that Plaintiff failed to timely exhaust administrative remedies on her KAAD claims such that the court lacks jurisdiction over

those claims.  It contends Plaintiff's hostile work environment claim fails because the alleged harassment was not severe or pervasive, and because Defendant is entitled to an affirmative defense for employers that take appropriate remedial action in response to reported harassment. Defendant argues it is entitled to judgment on claims of disparate treatment and retaliation because Plaintiff did not suffer adverse employment action and the evidence does not give rise to a reasonable inference of discrimination or retaliation.  Finally, Defendant argues it is entitled to summary judgment because the evidence shows Defendant had a legitimate, non-discriminatory reason for its actions.  (Doc. 64 at 1-2.)

## II.  Motion for Summary Judgment (Doc. 63.)

### A.  Uncontroverted facts

In keeping with the standards governing summary judgment, the following statement views the evidence in the light most favorable to Plaintiff.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (evidence is viewed in the light most favorable to the non-moving party because credibility determinations, weighing conflicting evidence, and drawing appropriate inferences are jury, rather than judge, functions).

Defendant is a franchisee of several McDonald's restaurants including two in Pittsburg, Kansas – one in the north part of town and one in the south, a few miles apart from each other. From 2000 to 2002, Plaintiff worked as a crew member at both the north and south stores.  Plaintiff then left Defendant's employment until 2015, when she was rehired as a crew member.  She then worked primarily at the south store. (Doc. 64 at 2.)

Plaintiff was promoted to shift manager within a few months of returning in 2015 and was later promoted to department manager ("DM") of two departments.  Shift managers oversee the placement of employees at workstations during their shifts, can send employees home, and can

write them up for discipline.  DMs don't oversee employee placement but run one of three specified restaurant departments – Kitchen, Guest Services, or People.  DMs have overlapping authority to write up employees, but DMs cannot otherwise discipline employees.  Plaintiff's pay was based upon her position as a DM, although she sometimes performed the duties of a shift manager.  DMs are directly supervised by store managers (also referred to as general managers). (*Id.* at 3.)

Defendant had a policy during Plaintiff's tenure prohibiting harassment, discrimination, and retaliation for engaging in protected conduct.  Plaintiff signed an acknowledgement on June 8, 2015, that she had received and read the policy.  Plaintiff understood that the policy required employees to bring incidents of discrimination to the attention of their immediate supervisor.  From December 2017 to the end of her employment, Kelsey McClure, the store manager of the south store, was Plaintiff's immediate supervisor. (*Id.* at 4.)

Prior to May 2018, David Hadley[1] had been a crew member and was training to become a shift manager.  Hadley became a shift manager only a few days before the end of Plaintiff's employment.  Plaintiff testified that Hadley frequently commented on her weight and appearance, said that women shouldn't work on the grill because they can't work fast enough, and called Plaintiff a "she-male" and "thick."  Hadley made comments to the effect that women can't do their jobs like men can.  On multiple occasions Plaintiff verbally complained about Hadley's behavior to McClure, her immediate supervisor, and to McClure's supervisor, Vanessa Ketcham, the area supervisor for the south store.  After she did so, the behavior would briefly stop, but it would start up again and Plaintiff would have to complain again.  (Doc. 64-1 at 5; Doc. 80 at 11.)

---

[1] On March 13, 2022, Defendant filed a supplemental Rule 26 disclosure stating that Mr. Hadley has passed away and is no longer available as a witness.  (Doc. 84.)

In February of 2018, Plaintiff's boyfriend, who also worked for Defendant, left Plaintiff a Valentine's Day present in the office at the south store.  As Plaintiff walked in the office, Hadley grabbed her and kissed her, saying he was sure her boyfriend "wanted me to give that to you also." (Doc. 64-1 at 28.)  Hadley tried to kiss her fully on the lips but Plaintiff pulled away so that Hadley kissed her half on the lips and half on the cheek.  (*Id.* at 28-29.)  Plaintiff verbally informed Ketcham and McClure of Hadley's actions.  Although Defendant's policy requires that violations or discipline be included in personnel files, Hadley's personnel file contains no record of complaints or discipline.

On May 17, 2018, Plaintiff was not scheduled to work and was home sick with strep throat. She had called in sick and provided a doctor's note to Hadley.  Hadley nevertheless called her and asked her to come in, telling her the store was short-staffed and he had been unable to get in touch with other managers, and that Plaintiff was his last resort even though she was sick.  (Doc. 80-2 at 33.[2]) Plaintiff went in to work.  Plaintiff testified that on prior occasions when a DM was out, whether it was because of sickness or a day off, if the store was short-handed Ketcham had "made it very clear that it was our jobs as the DMs … to go in," and they "got yelled at … for not going in."  (Doc. 80-2 at 36.)  Plaintiff testified that after she began work that morning, Hadley disappeared for an extended period, leaving her to cover both the drive-thru and the kitchen.  When McClure arrived at the store, Plaintiff informed her she could not locate Hadley.  When Hadley finally showed up, McClure told him he needed to move Plaintiff from the drive-through to another position because she was not feeling well.  Hadley refused, prompting McClure to say she was going to look at the security camera video to see where Hadley had been for the last hour.  (Doc. 80-2 at 35-37.)  Hadley turned and confronted Plaintiff, yelling at her and calling her a "stupid

---

[2] McClure testified she may also have asked Plaintiff to come in the morning of May 17 despite the fact that Plaintiff was not feeling well.  (*See* Doc. 80-9 at 26.)

crybaby bitch." (Doc. 80-2 at 36.) Plaintiff responded that she was sick and was not even supposed to be there or handle food, and said it was even harder doing it all by herself. (*Id.*) Hadley continued yelling at Plaintiff, called her a "stupid fucking bitch," a "cunt," and threatened to kick both her ass and her boyfriend's ass. (Doc. 64-1 at 37; Doc. 83-2 at 7; Doc. 64-8 at 3.) Hadley was standing over Plaintiff, screaming, and pointing his finger in her face. Plaintiff is approximately 5 feet 1 inches tall and weighs about 100 pounds. Hadley is over 6 feet tall and weighs 250 pounds or more. (Doc. 80-2 at 37.) The incident took place in front of customers, crew members, and McClure. McClure said and did nothing as Hadley confronted Plaintiff. (*Id.* at 38.) Megan Fordyce (another shift manager and DM) was also present at the store that morning.

Plaintiff was crying and shaking profusely. (Doc. 80 at 1-2.) Fordyce asked Hadley to leave the store; he refused to leave. (Doc. 80-5 at 125.) Hadley violated a number of Defendant's policies on May 17, 2018, including policies on harassment, social media, insubordination, and professionalism. (Doc. 80 at 2.)

Plaintiff left the store without obtaining advance permission from her supervisor (McClure), which was contrary to Defendant's policies. Plaintiff called Ketcham on the phone. Ketcham, who had taken the day off, asked Plaintiff, "What the fuck do you want?" (Doc. 80-2 at 39.) Plaintiff explained what happened and told Ketcham she had left the store. Ketcham said "if you want to keep your job, you better get your ass back to work." (*Id.*) Ketcham said she would call Plaintiff back and hung up. (*Id.*)

Plaintiff texted McClure a screenshot of a Facebook public post Hadley made shortly after the incident, while he was still at work, that said "Lol better get ur lies straight bitch I'm not the one to back down so let's play." (Doc. 64 at 8; Doc. 80 at 2.) McClure also saw a screenshot of a post by Hadley about the same time that said, "Sick of these woman thinking their shit don't

stink.  Fact check produce with Ur body not ur mouth and you will get more respect." [sic] (*Id.*)
McClure feared for Plaintiff's safety and told her not to return to work that day until Hadley was
gone.  McClure sent Hadley home an hour early from his shift and notified Plaintiff.  Plaintiff then
returned to the store and worked additional hours that day.  McClure shared Hadley's Facebook
posts with Ketcham.  (Doc. 80-9 at 15.)

The next day, Friday May 18, 2018, Plaintiff and Hadley had been scheduled to work
overlapping shifts, but McClure altered Plaintiff's schedule so they would not be working at the
same time.  Plaintiff attempted to call Ketcham, but she did not answer.  Plaintiff texted Ketcham
and McClure at 10:10 a.m. stating that she decided not to come in that day because of the hostile
situation the day before and because her schedule "has been rearranged to suit the bully…." (Doc.
80-7.)  She complained about Hadley's derogatory statements about women, indicated she did not
feel safe when Hadley "could explode [at] any moment," said McClure (Plaintiff's supervisor)
admitted the day before that she was scared to talk to Hadley alone, and asserted that Hadley
"smoke[s] weed on the property while clocked in" and it "makes him very unstable."   (*Id.*)
Ketcham's text response was, "You need to call me unless this is you quitting, then there's no
need."  (*Id.*)  Plaintiff responded that "I absolutely don't want to quit my job [as] I have kids to
take care of," but asserted that she should not have to lose hours or have her schedule rearranged
"to accommodate a bully."  (*Id.*)  Ketcham responded, "Then you call me as stated above." (*Id.*)

Plaintiff met in person with Ketcham and McClure on May 18th.  At the meeting, Ketcham
told Plaintiff she was being placed on probation because, according to Defendant, Plaintiff "yelled
and argued with Hadley in front of customers and crew members."  (Doc. 64 at 9.)  Plaintiff
protested that she had not started the argument with Hadley.  (Doc. 64-1 at 46.)  Plaintiff also cites
evidence, including her own testimony, from which a reasonable jury could find that she did not

yell at Hadley during the incident.  (*See* Doc. 80 at 14.)  For purposes of summary judgment, the court accepts Plaintiff's version of the facts as true.  Plaintiff, who feared losing her job, signed an acknowledgment of being placed on probation even though she thought it was unfair.

 Defendant asserts that Hadley "was similarly placed on probation" and Plaintiff was informed at the May 18 meeting that Hadley had been placed on probation.  ((Doc. 64 at 9; Doc. 80-2 at 42.)  But Plaintiff cites evidence that Hadley's personnel file contains no documentation of any discipline, despite a policy that such discipline should be documented in the file.  (Doc. 80 at 14.)

Ketcham had decided to discipline Plaintiff prior to meeting with her on May 18.  Ketcham did not speak with anyone about the May 17 incident other than Plaintiff, Hadley, and McClure. Ketcham did not review the surveillance video from the store although she was aware that the incident would have been on video.  (Doc. 80 at 3-4.)

 Plaintiff had previously worked at the north McDonald's store.  Plaintiff was a single mother of six children and, in addition to her job at the south McDonald's, she was also working a second job in the evenings at a shoe store that was close to the north store.  At some point, Ketcham raised the possibility of moving Plaintiff from the south McDonald's store to the north store.

On Monday, May 21, 2018, Ketcham texted Plaintiff asking, "So, why are you not here at work today?"  (Doc. 80-8 at 1.)  Plaintiff responded that she had been told her shift was covered by another employee.  (Doc. 80-8 at 1.)  When Ketcham said that wasn't the case, Plaintiff complained about the lack of a plan to keep her safe from Hadley.  She said nobody understood the stress she was under and that she was having anxiety attacks.  She complained about Hadley's behavior, saying he "blows up all the time and treats me like crap," and said McClure had been

scared to confront him.  (*Id.* at 2.) Plaintiff said, "I just don't think [you] understand how many female managers are scared of him when he gets in his moods."  (*Id.*) Plaintiff had been "told I could move stores but I shouldn't have to."  (*Id.*)

Ketcham and/or Thomas Nichols, Defendant's owner, decided to transfer Plaintiff to the north McDonald's store.  Nichols phoned Mark Young, the manager of Defendant's north McDonald's store, on Monday May 21 and told him Plaintiff was being transferred.  (Doc. 80-17 at 3.)  On the afternoon of Tuesday, May 22, Young texted Plaintiff.  Plaintiff, who did not recognize the number, asked who it was.  Young responded that, "It's mark," and said, "I have a Shift available tomorrow if you want it." (Doc. 80-17 at 1.)  Plaintiff did not respond.  The next morning, May 23, Young texted Plaintiff, "We are assuming you don't wanna work here and quit." (*Id.*)  Plaintiff responded that she was a DM and asked if he had a DM position available and indicated that she needed a schedule so she could coordinate with her second job.  Young responded that Nichols had "said no DM." (*Id.* at 2.)  After some back and forth, Young said he would add Plaintiff to the next schedule.  Plaintiff said "ok" but indicated she was going to find out "why I am being demoted and no one even asked me if I wanted to go to [your] store." (*Id.* at 2.)  Young indicated he had some "random" shifts available that week.  Plaintiff asked Young to send the schedule and said she would let him know after talking to Nichols.  (*Id.* at 3.)

Young sent Plaintiff information on available shifts.  Plaintiff indicated she could do parts of them that were not in the late afternoon or evening, noting that her schedule at the south store allowed her to work a second evening job.  She volunteered to come in at 6 a.m. and work from 6 a.m.to 2 p.m., which would cover peak hours, but Young responded that "[a]ll we have are late afternoons and evening," adding that he already had four managers working days.  (Doc. 80-17 at

5.)  In response to Plaintiff's indication that she would like to talk to Nichols about it, Young said Nichols was "already aware of the situation and told me to give the hours I have."  (*Id.*)

On May 23, 2018, Plaintiff had a text exchange with Nichols.  Plaintiff asked why she was being demoted, saying she had earned her spot as a DM.  Nichols said "we don't have any spots open there [at the north store] on DMs."  (Doc. 80-13 at 1.)  He said her pay would not change but she "[j]ust won't get a bonus check" because she was on probation.  (*Id.*)  Plaintiff responded that she had not been told anything about a demotion and would not have signed the paper acknowledging probation if she had, because she felt she was in the right leaving the store when Hadley was screaming at her and threatening her.  Nichols said the probation paperwork didn't say anything about a DM spot because such spots were "at my discretion."  (*Id.* at 2.)  When Plaintiff complained that taking away her bonus was taking away her pay, Nichols responded, "it's just that, a bonus" which "we can pay out or not at our discretion."  (*Id.*)  Plaintiff asked why she was being moved instead of Hadley when she had been working at the south store for three years. Nichols said he had discussed it with both stores and that since she was more experienced, she was better suited to move to the north store, plus Ketcham had told him Plaintiff lived up north in Frontenac.  Plaintiff responded that her boyfriend lived in Frontenac but she lived five blocks from the south store.  Nichols replied, "well either way, it's all Mcds at the end of the day, no matter if it's North or South," and said she would do well at the north store.  (*Id.*)

On Thursday morning May 24, Plaintiff texted Nichols complaining that Nichols had told her nothing would change, but Young said the north store did not have days available, and so "I am not sure what I am supposed to do" about her evening job.  (*Id.* at 3.) Nichols said Young "has a meeting with you Friday to work out all that kind of stuff" about scheduling.  (*Id.*)

Plaintiff then texted Young asking, "So we have a meeting tomorrow to discuss [hours]?" (Doc. 80-17 at 8.)  Young replied yes although he had not yet set one up.  (*Id*.)  Plaintiff noted she was scheduled to be out of town on certain dates including June 6, when she had a lawyer's meeting set up in Kansas City.  (*Id.*)

Kim Southern, the supervisor of the north store, texted Plaintiff and Nichols (in a group text) the morning of May 24.  She pointed out that Young had sent Plaintiff a schedule of available shifts at the north store and said they had to work Plaintiff in where they could.  Southern said they would try to work around Plaintiff's second job but could not guarantee hours.  Southern said she and Young would like to sit down with her "to clarify our expectations for you as a new manager on his team," adding that Friday (the following day) was available, and "[w]e can set this meeting for 2 pm."  (Doc. 80-19 at 2.)   Southern added that "[a]t this point, you need to decide and let us know if you want to work the available hours."  (*Id.*)  Plaintiff indicated she thought it was unfair that she was demoted from DM to shift manager, was offered random shifts in place of a set schedule, and was being deprived of a bonus, despite Nichols' representation to her that "nothing would change" with the transfer.  She indicated all of this made it extremely difficult to keep her second job, make house and car payments, and take care of her kids.  Plaintiff said "it's all stressing me out," but said she would see Southern at 2:00 p.m. the next day. She added that "[i]f this is [your] guys way to make me quit it's absolutely horrible" and "I didn't do anything to be treated this way!"  (*Id.*)

 Plaintiff did not show up for the 2:00 meeting on May 25.  Southern texted Plaintiff at 2:06 p.m. asking if she was running behind and, if so, to let her know.  After receiving no response, Southern emailed another manager at 2:14 stating that Plaintiff did not show up for the 2:00

meeting and "I assume she's quit."  (Doc. 64-5 at 1.)  Defendant did not thereafter attempt to contact Plaintiff or schedule hours for her.

### B.  Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Sotunde v. Safeway, Inc*., 716 F. App'x 758, 761 (10th Cir. 2017). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol—Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Id*. Any statement of fact that has not been controverted by affidavit or an exhibit is deemed to be admitted. D. Kan. Rule 7.4. Also, the court will only consider facts based on personal knowledge or supported by exhibits. Conclusory allegations are not sufficient to create a dispute as to an issue of material fact. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### C.  Analysis

**1.  *Exhaustion of KAAD claims***.  In response to Defendant's argument that Plaintiff did not timely and properly exhaust administrative remedies on her claims under the KAAD, "Plaintiff withdraws her KAAD claims."  (Doc. 80 at 19 n. 6.)  Accordingly, Plaintiff's KAAD claims are DISMISSED WITHOUT PREJUDICE for failure to exhaust administrative remedies.

**2.** ***Hostile work environment claim***. Defendant next contends that Plaintiff fails to cite evidence of conduct sufficiently severe or pervasive to support a hostile work environment claim.

Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's sex. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citing 42 U.S.C. § 2000e–2(a)(1)). The phrase "terms, conditions, or privileges of employment" goes beyond economic discrimination; it evinces a congressional intent to address the entire spectrum of disparate treatment of men and women in employment, including conditions that require a person to work in a discriminatorily hostile or abusive environment. *Id.* (citations omitted.) "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' … that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' … Title VII is violated." *Id.* This standard "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* Whether an environment is "hostile" or "abusive" can be determined only by looking at the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Id.* at 23.

The court finds Plaintiff has cited evidence from which a reasonable jury could find that Plaintiff was subjected to conditions sufficiently severe and pervasive to support a claim of sex discrimination. Plaintiff cites evidence that Hadley frequently made offensive comments in the workplace about the inferiority of women generally. She also cites evidence that he frequently directed derogatory comments specifically at her based on her sex (e.g., "she-male"). Such

comments alone might be unlikely to support a hostile work environment claim, but Plaintiff cites substantial additional evidence.  She cites evidence that Hadley engaged in offensive and unwanted physical touching by grabbing her and kissing her against her will.  Plaintiff also cites evidence that Hadley engaged in a physically intimidating encounter at work in which he screamed at her and threatened to assault both her and her boyfriend.  Hadley, who was far bigger than Plaintiff, confronted Plaintiff in an essentially out-of-control manner – towering over Plaintiff, threatening her, pointing in her face, and screaming derogatory slurs based on her sex, including "bitch" and "cunt."   Plaintiff cites evidence that her manager witnessed the encounter but was afraid to intervene or speak up because she was physically intimidated by Hadley.  Shortly after the encounter, Hadley only increased the threatening nature of it by refusing a manager's directive to leave the premises.  Hadley then confirmed a continuing animus against Plaintiff on account of her sex, posting messages on Facebook (which a jury could find were clearly directed at Plaintiff) again calling her "bitch" and vowing he would not "back down," and telling her she would get more respect if you "produce with Ur body not ur mouth."  (Doc. 64 at 8.)  These apparent attempts to humiliate or threaten Plaintiff could reasonably be construed by a jury as representations by Hadley that he intended to continue, if not escalate, his harassment of Plaintiff in the workplace. When the combination of factors supported by evidence is considered here, including frequent derogatory remarks about female workers, frequent comments directed at Plaintiff based on her gender, unwanted and forced physical touching in the form of an attempt to kiss Plaintiff against her will, a serious physical threat and out-of-control workplace confrontation accompanied by vulgar comments based on Plaintiff's gender, and an indication by the alleged harasser that such conduct would continue, a reasonable jury could find that Plaintiff's workplace was "permeated with 'discriminatory intimidation, ridicule, and insult,' … that is 'sufficiently severe or pervasive

to alter the conditions of the victim's employment and create an abusive working environment.'"
*Harris,* 510 U.S. at 21.

**3.** ***Ellerth/Faragher defense***.  Defendant contends it is entitled to summary judgment under the *Ellerth/Faragher* affirmative defense, which provides that where "no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages" by showing "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998).

Defendant has not shown it is entitled to summary judgment by virtue of this defense. Plaintiff has cited evidence from which a jury could reasonably conclude that, regardless of the other elements of the defense, Defendant did not exercise reasonable care to prevent and promptly correct sexually harassing behavior.  Plaintiff cites evidence from which a jury could find that Defendant did little or nothing in response to Plaintiff's frequent reports of Hadley's derogatory comments about women or in response to Plaintiff's report that Hadley forcibly grabbed and kissed her.  Defendant argues that the appropriateness of its response is shown by the fact that after Plaintiff complained, "Hadley would stop his behavior," and after she reported the kiss, Hadley "did not ever attempt to kiss or touch her again."  (Doc. 64 at 18.)  But this ignores Plaintiff's evidence that she had to repeatedly complain about Hadley's behavior, and at any rate it fails to show that Defendant took any significant disciplinary action against Hadley as a result of Plaintiff's complaints.  As for the May 17 incident, a jury could similarly conclude that Defendant's response was not reasonable.  A jury viewing the evidence in Plaintiff's favor could conclude that Defendant's response – when it knew that Plaintiff had in fact been physically

threatened and inappropriately demeaned in its workplace – was first to alter her hours and then to involuntarily transfer her (rather that the harasser) to another store; to cut her hours and put her on probation without just cause[3]; and to offer her a Hobson's choice of losing her job or taking a position without the regular bonuses she had previously received, without the DM title she had previously earned, and without the regular hours she had previously enjoyed that allowed her to manage her kids' schedules and work a second job.  A jury could easily find Defendant's response was not a reasonable effort to prevent and correct sexually harassing behavior.  In view of this conclusion, Defendant is not entitled to summary judgment on the *Ellerth/Faragher* defense.

   **4.  *Disparate treatment claim*.**  Defendant contends Plaintiff's claim that she suffered disparate treatment on account of sex fails because Plaintiff did not suffer any adverse employment action, because no inference of disparate treatment arises from the evidence, and because Defendant's actions were supported by legitimate, non-discriminatory reasons.  The court finds these arguments do not entitle Defendant to summary judgment.

   "An adverse employment action includes acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Harper v. Arrow Elecs.*, No. 21-1011, 2021 WL 6071625, at *4 (10th Cir. Dec. 21, 2021) (quoting *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (brackets and internal quotation marks omitted)).  Mere inconvenience or alteration of job responsibilities will not suffice, but adverse actions are not limited to monetary losses in the form of wages and benefits.  *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998).  Plaintiff cites evidence, which if believed by a

---

[3] Defendant contends Plaintiff was put on probation "for getting into an argument [with Hadley] on the front counter." (Doc. 83 at 1.)  A jury could reasonably find that Plaintiff hardly said anything in response to Hadley's tirade and that her participation in the "argument" was forced upon her by Hadley's physically threatening behavior.

jury, would show she was offered the option of continuing to work with a male employee who had threatened and berated her on account of sex, or accept a materially adverse change in her compensation, working conditions, and benefits.  The job Defendant offered Plaintiff at the north store would have resulted in the loss of a bonus Plaintiff had regularly received in the past, a demotion in position from DM to shift manager, and the deprivation of a regular daytime schedule that was critical to Plaintiff's ability to care for her family. Contrary to Defendant's suggestion, these would not be "trivial employment actions" (Doc. 83 at 7) to a reasonable person in Plaintiff's circumstances.  Plaintiff has cited evidence that could support a finding that she was subjected to an adverse employment action.

Defendant also contends Plaintiff has failed to cite evidence that she was treated less favorably than similarly situated employees, asserting that Hadley was "similarly disciplined for yelling in front of customers." (Doc. 64 at 22.)  But Plaintiff cites evidence that she, unlike Hadley, did not yell in front of the customers, and that whatever Plaintiff may have said to Hadley during the May 17 encounter (e.g., Doc. 64-1 at 35, "I told him that he needed to run his shift better") paled in comparison to Hadley's screaming "stupid fucking bitch" and "cunt" at Plaintiff, his use of physical intimidation, and his threats to do bodily harm to both Plaintiff and her boyfriend.  A jury could reasonably find that Defendant inexplicably treated Plaintiff more harshly than the instigator of – and the far more culpable party to – the argument.  A jury could find that Hadley's conduct was egregious while Plaintiff did little more than to attempt to verbally defend herself against an unjustified attack.  Given that Defendant's proposed employment action was to send Plaintiff rather than Hadley to another store, while also demoting her and wreaking havoc with her schedule, a jury could reasonably infer that Plaintiff was treated less favorably by Defendant on account of her sex.  In that regard, a jury could also consider and choose to give weight to evidence

that Defendant knew Hadley had a significant history of making inappropriate comments about women in the workplace and had forcibly kissed Plaintiff on a prior occasion, yet Defendant proposed leaving Hadley in place at the south store and moving Plaintiff to the north store under the unfavorable conditions noted above.

Defendant suggests its decision to transfer Plaintiff to the north store was motivated by the fact that Plaintiff refused to work at the same store as Hadley, that Hadley did not have a driver's license, that Hadley lived close enough to walk to the south store, and that Ketcham "thought Plaintiff lived by the North store." (Doc. 64 at 10.) Defendant thus contends moving Hadley to the north store "was not practical" and argues that Plaintiff has failed cite any evidence that her transfer to the north store was a pretext for discrimination. (*Id.* at 24.)

The court rejects this argument and finds Plaintiff has cited sufficient evidence to raise a genuine issue of fact concerning pretext. "An employee may show pretext based on 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." *See Stroup v. United Airlines, Inc*., 26 F.4th 1147, 1159 (10th Cir. 2022) (quoting *Timmerman v. U.S. Bank, N.A*., 483 F.3d 1106, 1113 (10th Cir. 2007)). Insofar as Defendant suggests that it considered whether it was practical to move Plaintiff rather than Hadley to the north store, Plaintiff cites evidence that transferring her would severely impact her ability to take care of her kids and work a second job – facts she conveyed to Defendant but which Defendant essentially ignored or dismissed. Moreover, there is no evidence Defendant ever actually took these factors into account or compared them to the burden on Hadley from being required to find transportation to the north store a few miles from his home. Plaintiff also cites evidence that although Nichols may have initially believed Plaintiff lived near the north store, Plaintiff informed

him she actually lived near the south store, but he then dismissed the fact, saying, "well either way, it's all Mcds at the end of the day, no matter if it's North or South." (Doc. 8013 at 2.) A jury weighing all of the evidence could also conclude that Defendant's placement of Plaintiff on probation for the May 17 incident was unjustified and unsupported by the facts. It could further find Defendant treated Plaintiff less favorably than Hadley and now offers an explanation for the differing treatment that is weak, unsupported by the facts, and unworthy of belief. Defendant's motion for summary judgment on Plaintiff's disparate treatment claim is therefore denied.

**5. _Retaliation claim_**. The anti-retaliation provision of Title VII prohibits an employer from discriminating against an individual who has "opposed any practice made an unlawful employment practice" by Title VII. *Reznik v. inContact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021). Defendant argues that Plaintiff's retaliation claim fails because (1) she did not engage in protected opposition to discrimination; (2) she suffered no adverse employment action; and (3) she has not shown a causal connection between the protected activity and the adverse action. (Doc. 64 at 25.) Defendant thus argues Plaintiff has failed to show any of the three elements of a prima facie case of retaliation. *See id.* (listing the above three elements of a prima facie case under Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a)).

Plaintiff has cited evidence sufficient to support all three elements. The first element requires Plaintiff to cite evidence that she engaged in protected opposition to discrimination. Plaintiff does not have to show that she reported an actual Title VII violation; she need only show a reasonable good-faith belief that she was opposing discrimination. *Lamb v. Montrose Cty. Sheriff's Off.*, No. 19-1275, 2022 WL 487105, at *4 (10th Cir. Feb. 17, 2022) (citing *Zokari v. Gates*, 561 F.3d 1076, 1081 (10th Cir. 2009)). Plaintiff has cited evidence to satisfy this requirement. She repeatedly complained to her supervisors about Hadley's offensive comments

about women in the workplace.  She also reported Hadley's attempt to forcibly kiss her.  After the May 17 incident, Plaintiff complained to supervisors McClure and/or Ketcham that Hadley had made the work environment hostile, intimidating, and unsafe; that Hadley made sexually inappropriate statements only minutes after the incident to the effect that Plaintiff should (as phrased by Plaintiff in a text message complaint) "use her body and she would get further in life;" informed them that Plaintiff "can't take his he is better cause he's a man stuff anymore," and complained that she had been told she could move stores "but I shouldn't have [to]," and that "I just don't think [you] understand how many female managers are scare[d] of him."  (Doc. 80 at 3.)  This evidence is sufficient to show that Plaintiff opposed and complained of unlawful sex discrimination in the workplace.  *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (quoting *Hertz v. Luzenac Am., Inc*., 370 F.3d 1014, 1015 (10th Cir. 2004) ("protected opposition can range from filing formal charges to voicing informal complaints to superiors.")

The second element – an adverse employment action – is satisfied by evidence previously discussed about the detrimental effect on Plaintiff from a transfer.  A plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citation omitted.)   A reasonable worker in Plaintiff's position would have considered the deprivation of bonuses, demotion in position, and change in hours resulting from the transfer to be materially adverse. *Cf. Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 69 (2006) ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.") With respect to the third element of a prima facie case – a causal connection between the complaint and the adverse action

– Plaintiff has likewise cited evidence from which a reasonable jury could infer such a connection. The timing between her complaint and the transfer alone creates a strong inference that the adverse action resulted from her complaint of sexual harassment. *See e.g., Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) ("If the protected conduct is closely followed by the adverse action, courts have often inferred a causal connection.")   At any rate, Defendant essentially concedes a connection, asserting that it transferred Plaintiff in part because "she did not want to work with Hadley." (Doc. 64 at 24.)  That can only refer to Plaintiff's complaints described above concerning Hadley's harassment.   Plaintiff has accordingly shown a genuine issue of fact as to whether Defendant unlawfully retaliated against her in violation of Title VII.[4]

### III.  Motion for Sanctions for Spoliation of Evidence (Doc. 65.)

Plaintiff asserts that Defendant "has been unable to produce any documents or other evidence regarding the [May 17] incident or subsequent acts" with the exception of a single email from May 25, 2018.  (Doc. 65 at 2.)  Plaintiff argues that Defendant's "loss or destruction of contemporaneous records … makes it difficult, if not impossible, to show the reasons Defendant had for taking disciplinary action on May 18…." (*Id.* at 3-4.)  Plaintiff argues Defendant "should be prevented from asserting any affirmative defenses that could have been contradicted by evidence that was lost and/or destroyed," and that the court "should give an adverse instruction at trial." (*Id.* at 4, 23.)  Plaintiff further moves for "appropriate sanctions, her attorney's fees and costs, and for such other relief that the Court deems proper." (*Id.* at 23.)

In response, Defendant asserts that "most of the documents [Plaintiff] claims [Defendant] failed to preserve simply never existed."  (Doc. 70 at 3.)  Defendant contends that an Equal Employment Opportunity Commission (EEOC) letter it received on July 2, 2019, was the first

---

[4] In view of this finding, the court need not address Plaintiff's additional assertion that Defendant engaged in "retaliatory harassment," a contention that appears to be based on the same evidence noted above. (*See* Doc. 80 at 28.)

notice it received of an obligation to preserve relevant records, and that it searched all records it had in response to the letter.  (*Id.* at 3.)  It concedes that a video of the May 17 incident existed but says it was deleted as part of a routine deletion procedure that occurs every month.  (*Id.* at 4.)  It also contends that Ketcham wrote up both Plaintiff and Hadley for the May 17 incident but "Ketcham does not recall" if she ever placed these documents in the files.  (*Id.*)  Defendant notes that its employees searched records in connection with their depositions but the searches produced no additional information, and it argues Plaintiff did not diligently pursue these materials by moving to compel their production.  Defendant argues it did not violate a duty to preserve documents, that it did not act in bad faith, and that Plaintiff has not shown prejudice.

As a general rule, "[s]poliation sanctions are proper when (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Equal Emp. Opportunity Comm'n v. JetStream Ground Servs., Inc.*, 878 F.3d 960, 964 (10th Cir. 2017) (quoting *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009) (internal quotation marks omitted)).

The materials cited by Plaintiff indicate an almost complete absence of records on Defendant's part with respect to the incidents central to this litigation.   At this point, Plaintiff has raised spoliation issues that may merit further scrutiny.  But a number of circumstances remain unclear, including Defendant's practices concerning record-keeping, when Defendant had reason to know litigation was imminent, and how Plaintiff might be prejudiced by the violation of any duty to preserve evidence.  Under the circumstances, the court will deny the motion for sanctions without prejudice to reassertion.  Depending upon the evidence introduced at trial, Plaintiff may renew its motion for sanctions and its request for a jury instruction on spoliation at trial, and the court will consider at that time whether such an instruction, or any other sanction, is appropriate.

**IV.  Conclusion**

Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  The motion is GRANTED as to Plaintiff's claims under the KAAD; such claims are DISMISSED WITHOUT PREJUDICE for failure to exhaust administrative remedies. Defendant's motion for summary judgment is DENIED as to all other claims.  Plaintiff's motion for sanctions (Doc. 65) is DENIED WITHOUT PREJUDICE to reassertion at a later date.  IT IS SO ORDERED this 10th day of May, 2022.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE